**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EK, by and through her** | : | **CIVIL ACTION** |
| **parent and nearest friend, A.G.,** | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 09-4205** |
| | : | |
| **WARWICK SCHOOL DISTRICT,** | : | |
| **Defendant** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                    **February 26, 2014**

        EK appeals from the adverse decision of a Due Process Hearing Officer which

denied her mother's request for reimbursement for a unilateral placement at a residential

school in upstate New York.  In suing the Warwick School District, EK brings four

counts: two counts under the Individuals with Disabilities in Education Act (the

"IDEA"), i.e., one for failure to provide a free, appropriate public education (a "FAPE");

and the other claiming that her case fits into one of the two exceptions to the IDEA's

statute of limitations; the third count alleges a violation of the Rehabilitation Act; and the

fourth count alleges a violation of the Americans with Disabilities Act.  The parties

agreed that the case should be decided on cross-motions for judgment on the

administrative record.  After the cross-motions and responses were filed, a hearing was

held at which the parties presented oral argument.  For the following reasons, I will grant

the defendant's motion and deny the plaintiff's motion.

# I. BACKGROUND[1]

EK has lived in the District since birth and was enrolled in the District's schools from kindergarten until the end of the 2004-2005 school year.  For eighth grade in the 2005-2006 school year, she attended Lancaster Mennonite Middle School, a nonpublic religious school.  In the Spring of 2006, EK was expelled from that school for fighting with another student.  At that point, EK was placed in the Philhaven Partial Hospitalization program.  Upon release, her mother re-enrolled her in the District which provided her with a period of homebound instruction.

In the Fall of 2006, pursuant to a Permission to Evaluate signed by EK's mother, the District conducted a detailed evaluation of EK.  The associated behavioral rating scales of that evaluation suggested that EK was functioning well behaviorally and emotionally in school overall, but that her behaviors at home were out of control.  She was described by her teachers as respectful towards adults.  The evaluation concluded that EK was not a student with a disability who needed specially designed instruction.  She did not meet the criteria for a learning disability or an emotional disturbance under the IDEA, and accordingly was ineligible for special education.  Finally, this evaluation recommended that if the District were to find that EK's Attention Deficit Hyperactivity Disorder ("ADHD") impacted her academic achievement, a Service Agreement under Section 504 of the Rehabilitation Act could be implemented.  EK's mother agreed with

---

[1] After a four-session hearing, the Hearing Officer provided eighty-four detailed findings of fact in her decision which are summarized here.  I note that these findings have abundant support in the record.

the findings of the evaluation report.  It is interesting to note that after a team meeting at the end of November 2006, the District determined that EK's ADHD was not negatively affecting her in the classroom, and that she would not be given a Section 504 Service Plan.

In early 2007, upon learning of her daughter's illicit drug use, EK's mother placed EK at the Caron Foundation for drug addiction treatment where she remained for four months.  The staff at Caron noted that EK excelled in the classroom while in treatment.  Upon discharge, EK was enrolled at Lancaster Catholic High School for the repeat of her ninth grade in 2007.  Unfortunately, in late September 2007, EK made a suicide gesture/attempt and was returned to Philhaven Hospital.  EK was transitioned back to Lancaster Catholic but was removed in late February 2008 for sending a threatening message.  Her mother re-enrolled her in the District which provided homebound instruction for the remainder of the 2007-2008 school year.  EK was also receiving mental health services through Family Based Services including outpatient therapy and a drug/alcohol counseling group, but was uncooperative with most of these services.

EK's mother began to feel that the homebound instruction was not working.  EK's therapist and counselor believed that their services were also not working.  Thus, the family planned to withdraw EK from all education programs.  When they learned about Pennsylvania's compulsory school attendance requirements, however, the family agreed to allow the District to re-evaluate EK for special education purposes.  In August 2008, the evaluation report was completed by Dr. Daniel Pezzulo, a psychologist for the

3

District.  Dr. Pezzulo concluded that EK suffered from an "other health impairment" due to her ADHD, but no other IDEA disability.  Dr. Pezzulo also believed that EK's alcohol and drug use interfered with her learning.  The diagnosis of ADHD sufficiently satisfied the criteria for a learning disability or emotional disturbance under the IDEA, and made EK eligible for specially designed instruction.

In late September 2008, however, after yet another trip to the Emergency Room for a suicide risk assessment, EK's family decided that EK would have to return to a rehabilitation center.  EK was scheduled to be admitted to White Deer Run, an inpatient substance abuse rehabilitation center, for treatment of her chemical dependency.  Her mother chose not to send her there because the mother was not satisfied with that facility. Instead, EK's mother contacted an individual who "does interventions and places people in rehabs."  He helped her find Clear Brook Lodge, a facility she preferred.[2]  EK was admitted there on October 13, 2008 and discharged on November 9, 2008.  Upon discharge, the Clear Brook staff recommended an alternative school setting for EK rather than a mainstream one, abstention from drugs, staying away from places associated with drug use, attending Alcoholics Anonymous/Narcotics Anonymous meetings, moving through the 12-step program, and continued work on spiritual issues.

In response to the August 2008 evaluation, the District and EK's mother met several times during the Fall of 2008 to develop an appropriate Individualized Education

_____

[2] This same individual also suggested that EK's mother consider sending EK to Family Foundation School, a residential placement center in upstate New York.  After some research, EK's mother found that school to be "perfect" for EK.

Plan ("IEP")[3] for EK.  The final IEP was completed on December 1, 2008 with the District's intent that if EK were enrolled at its proposed placement, i.e., Community School North, the IEP team would have requested the school's staff to further revise the IEP to complement the details of the setting.  EK would also be offered full-time emotional support services in a public school environment.  On December 9, 2008, EK's mother disapproved of the plan, saying, "This placement does not provide the level of therapeutic support [EK] needs at this time and does not provide general education academics/credits needed to apply for college after graduation."  Instead, she chose to continue homebound instruction.  In February 2009, EK's mother unilaterally decided to place her in the Family Foundation School.

On December 5, 2008, believing that her attempts to work collaboratively with the District were unsuccessful, EK's mother filed a Due Process Complaint with the Office for Dispute Resolution, challenging the appropriateness of the educational program

---

[3] An IEP is a written statement which must include:

(1)  a statement of the child's present levels of educational performance;

(2)  a statement of measurable annual goals, including benchmarks or short term objectives;

(3)  a statement of the special education and related services to be provided to the child;

(4)  an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class;

(5)  a statement of how the child's progress toward the annual goals will be measured.

See 20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.347.

offered by the District, and seeking compensatory education for a period of time
extending past the statute of limitations, and tuition and transportation reimbursement for
the unilateral placement in the New York residential facility.  See 20 U.S.C. § 1415(f)
(parents who are dissatisfied with their child's IEP are entitled to an "impartial due
process hearing"); see also Schaffer v. Weast, 546 U.S. 29 (2005) (at the due process
hearing, the parents have the burden of persuasion to show that a school district's IEP is
not legally sufficient).  After a four-session hearing, the Hearing Officer issued her
decision on June 21, 2009 in favor of the District, holding that the District had committed
no errors, and had satisfied its duty of providing EK with a FAPE.

    In her complaint here, EK seeks the reversal of the Hearing Officer's decision;
reimbursement for placing EK at the Family Foundation School; an award of four years
of compensatory education; a ruling that the two year statute of limitations is not
applicable in this case; a monetary award equivalent to the value of the services EK was
denied; and attorneys' fees.

## II.  STANDARD OF REVIEW

    In reviewing a dispute brought under the IDEA, a district court gives "due weight"
and deference to the findings in the administrative proceedings.  Bd. of Educ. v. Rowley,
458 U.S. 176, 206 (1982).  The Third Circuit has described this standard as a "modified
*de novo*" review.  S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260,
269-270 (3d Cir. 2003).  Factual findings from the administrative proceedings are to be
considered *prima facie* correct, and if the reviewing court does not adhere to those

findings, it is obliged to explain why.  Id. at 270.  The court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.  L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 n.4 (3d Cir. 2006).

The district court is not bound by the Hearing Officer's conclusions of law and the application of legal standards at the administrative hearing is subject to *de novo* review. In re Educational Assignment of Joseph R., 318 Fed. Appx. 113, 118 (3d Cir. 2009).  At the administrative and district court levels, the burden of proof lies with the party challenging the IEP.  Schaffer, 546 U.S. at 62.  Consequently, because the plaintiff challenged the IEP, she bears the burden here.

In seeking to make public education available to handicapped children, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful.  Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 192 (1982).  Congress expressly recognized that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome.  Id.  Thus, the intent of the legislation was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.  Id.

## III.  DISCUSSION

### A.  Statute of Limitations

EK first argues that the District failed in its duty to identify her as a student with a disability entitled to an IEP prior to September 2008.  EK contends that because of this failure, she is entitled to an enlargement of the statutory period for which she can request compensatory education and compensatory damages under the applicable statutes.  I do not agree.

In December 2004, Congress passed amendments to the IDEA which included an explicit two-year statute of limitations: "a parent or agency shall request an impartial due process hearing within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows."  See 20 U.S.C. § 1415(f)(3)(C).  This version of the IDEA also included two exceptions to the statute of limitations period.  The two-year period does not apply when the parent was prevented from requesting a due process hearing because of either:

> (i)    specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

> (ii)   the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

See 20 U.S.C. § 1415(f)(3)(D).  Here, in her decision, the Hearing Officer discussed the

two-year statute of limitations, and concluded that neither exception was applicable in this case.

EK's mother now argues that both exceptions apply.  She insists that the District erred by offering a Service Plan under § 504, and then withdrawing it.  This error, she contends, goes to the heart of the first of the two exceptions, i.e., "specific misrepresentations that it had resolved the problem forming the basis of the complaint." The plaintiff characterizes this action as the District pulling a "bait and switch" which prevented her from exercising her statutory rights.

The record belies this contention.  The 2006 evaluation recommended that *if* the District were to find that EK's ADHD impacted her academic achievement, *then* a Service Agreement under Section 504 of the Rehabilitation Act could be implemented. After a November 2006 team meeting which included two of EK's teachers, a counselor, a special education consultant and EK's mother, the District determined that EK's ADHD was not negatively affecting her in the classroom, and that she would not be given a Section 504 Service Plan.  EK's mother registered no dissent at the time.  Contrary to the plaintiff's contentions, there was no bait and switch.  Rather, it was only recommended that a Service Plan could be implemented if necessary.

Next, EK's mother argues that the second statutory exception was triggered by the District's giving her misinformation about ADHD and a Section 504 Plan, and withholding information about referring her daughter to the nurse to investigate EK's possible self-cutting.  This action, she insists, denied her information which she had a

9

right to know, i.e., "withholding of information from the parents that was required under this subchapter to be provided." Again, I am not persuaded.

EK's mother relies on a statement made to her by a guidance counselor in EK's 7th grade during the 2004-2005 school year. See Compl. ¶¶ 18, 60. She informed the guidance counselor that EK had been diagnosed with ADHD, and that a Section 504 Plan had been recommended by her physician. The guidance counselor allegedly responded that "it would take a lot more than ADHD to qualify EK for a Section 504 Plan." Id. It is implausible that such an alleged remark could have deterred EK's mother to the extent that it would have triggered an exception to the statute of limitations. The IDEA provides that an exception can apply only if the District made a misrepresentation and/or withheld information and that that conduct "prevented [the parent] from requesting the hearing." See 20 U.S.C. § 1415(f)(3)(D). According to the Pennsylvania Special Education Appeals Panel, any alleged misrepresentation or withholding of information must be intentional on the District's part. Educ. Placement of C.C., Spec. Ed. Op. No. 1866, at 10 (Mar. 5, 2008).

The record reflects that EK's mother continued to be a zealous advocate for her daughter throughout her school years. It also reflects, however, that EK's mother

> is a special education teacher who received certification in 1996. Her training included coursework about the IDEA. She has worked for the Intermediate Unit for almost twelve years. She is now working with the early intervention program, and has held other positions in learning support, life skills, and the school-to-work program. She has participated in IEP meetings and has

been present when parents are given Procedural Safeguard
Notices.

<u>See</u> Hearing Officer Decision at 6, ¶ 23.  Given her professional and educational

background and vast familiarity with the IDEA, it is not reasonable to believe that the

District's conduct, intentional or otherwise, could have prevented EK's mother from

requesting a hearing or otherwise exercising her rights under the IDEA.  Moreover, there

is no indication that the District intentionally misrepresented to EK's mother that it had

resolved a problem that had impeded EK's education, or that it intentionally withheld

information from EK's mother regarding EK's referral to the school nurse.

Additionally, courts have interpreted the second statutory exception as referring to

a school district's withholding of information regarding "the procedural safeguards and

prior written notice required by 20 U.S.C. § 1415(d)."  <u>See</u> <u>El Paso Indep. Sch. Dist. v.</u>

<u>Richard R.</u>, 567 F.Supp.2d 918, 945 n. 35 (W.D. Tex. 2008);  <u>see also</u> <u>D.G. v. Somerset</u>

<u>Hills Sch. Dist.</u>, 559 F.Supp. 2d 484, 492 (D.N.J. 2008) (the withheld information

referred to by the second exception represents procedural safeguards available to a parent

which include "filing a complaint and requesting an impartial due process hearing," as

provided for by law);  <u>Evan H. v. Unionville-Chadds Ford Sch. Dist.</u>, 2008 U.S. Dist.

LEXIS 91442 (E.D. Pa. 2008) (the second statutory exception to the limitation period

refers solely to the withholding of information regarding the procedural safeguards

available to a parent under that subchapter).  Here, the information allegedly withheld

from EK's mother is not related to the procedural safeguards or prior written notice

11

required under 20 U.S.C. § 1415(d).  Accordingly, the second statutory exception is also inapplicable.

The Hearing Officer did not err when she found that the statutory exceptions to the statute of limitations did not apply in this case.  The administrative complaint was filed on December 5, 2008.  Accordingly, because the scope of the case can only encompass events about which the family knew or should have known after December 5, 2006, EK's claim for an enlargement of the statutory period must fail.

**B.  Tuition Reimbursement**

EK next argues that the Hearing Officer erred by not approving her request for reimbursement of the tuition paid to the Family Foundation School.  She insists that, in arriving at that decision, the Hearing Officer incorrectly determined that the IEP was appropriate for EK.  Again, I must disagree.

The IDEA's grant of equitable authority empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act."  Florence County Sch. Dist. v. Carter, 510 U.S. 7, 12 (1993) (quoting In School Comm. of Burlington v. Department of Ed. of Mass., 471 U.S. 359, 369 (1985)).  Congress intended that the IDEA's promise of a FAPE for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents.  Id.  In cases where cooperation fails, however, "parents who disagree with the proposed IEP are faced with a

choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." Id. Tuition reimbursement is appropriate "only if a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper under the Act. Id.; accord Burlington, 471 U.S. at 374 ("If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement [was outside of the public school district]").

      1.  Appropriateness of the IEP

      The Hearing Officer concluded that "the District clearly offered [EK] an appropriate educational program and placement to address her disability classification." The IDEA requires that institutions receiving federal education funding provide a free and appropriate public education (a "FAPE") to disabled children. See 20 U.S.C. § 1412(a)(1). A FAPE includes special education and related services that:

    (A)    have been provided at public expense, under public supervision and direction, and without charge;

    (B)    meet the standards of the State educational agency;

    (C)    include an appropriate preschool, elementary school, or secondary school education in the State involved; and

    (D)    are provided in conformity with the individualized education program required under section 1414(d) of this title.

13

See 20 U.S.C. § 1401(9).  In order for a student to be eligible to receive a FAPE under

the IDEA, she must have a specific learning disability.[4]  A school district must give the

student a "full and individual" evaluation to determine whether she has a specific

learning disability.  20 U.S.C. § 1414(a)(1)(A).  Parents, of course, may request the

school district to conduct an evaluation.  Id. § 1414(a)(1)(B).  When not initiated by the

parents, the school district must obtain the consent of a parent for its initial evaluation

and for all its subsequent reevaluations.  Id. §§ 1414(a)(1)(D)(i)(I), (c)(3); 30 C.F.R. §

300.505.

A school district provides a FAPE by designing and implementing an

individualized instructional program set forth in an IEP, which must be reasonably

calculated to enable the child to receive meaningful educational benefits in light of the

student's intellectual potential.  Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d

194, 198 (3d Cir. 2004); see also Carlisle Area Sch. v. Scott P., 62 F.3d 520, 526 (3d Cir.

1995) (Under the IDEA, "[t]he core of this entitlement is provided by the IEP, the

package of special educational and related services designed to meet the unique needs of

---

[4]  A "specific learning disability" is defined in the regulations as a "disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations."  34 C.F.R. § 300.7(10)(i); see also 20 U.S.C. 1401(3)(A). The term specifically excludes "learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage."  34 C.F.R. § 300.7(10)(ii).  An IEP Team may find that a student has an specific learning disability if the child both "does not achieve commensurate with his or her age and ability levels in one or more of the areas [identified in the regulations], if provided with learning experiences appropriate for the child's age and ability levels" and "has a severe discrepancy between achievement and intellectual ability . . . in math calculation."  34 C.F.R. § 300.541(a).

the disabled child.")  The school district must conduct an evaluation of the student's

needs, assessing all areas of suspected disability, before providing special education and

related services to the child.  See 20 U.S.C. § 1414(b).  A child's IEP is continually

assessed by an IEP team comprised of the child's parents, special education teachers, and

other members of the school district familiar with the student.  See 34 C.F.R. §§ 300.344,

300.346.

　　　To provide a FAPE, the IEP "must be sufficient to confer some educational benefit

upon the handicapped child."  L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir.

2006).  The state's obligation is not unlimited, however, nor is it required "to maximize

the potential of handicapped children or provide optional level of services."  T.R. v.

Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000).  The IDEA represents

only a "basic floor of opportunity."  Carlisle Area Sch. v. Scott P., 62 F.3d at 534.

　　　Here, in determining that the District's IEP was appropriate for EK and that the

District had satisfied its duty of providing EK with a FAPE, the Hearing Officer provided

the following findings of facts which are amply supported in the record:

> 43.  The December 1, 2008 IEP notes "needs related to
> student's disability" as organizational skills, study skills,
> work completion, math, reading comprehension, and
> written expression. The IEP contains goals in the
> academic areas of vocabulary, spelling, written
> expression, reading comprehension and math. The
> December 1, 2008 IEP contains organizational/behavioral
> goals related to following school rules, using appropriate

15

problem-solving strategies and skills, improving social
skills and enhancing coping skills.[5]

44.  The December 1, 2008 IEP contains specially
designed instruction and related services through a
positive behavior support plan, regularly scheduled
counseling, access to additional counseling as needed, and
social skills instruction.

45.  The final IEP revision was completed on December 1,
2008 with the District's intent that if [EK] were enrolled
at its proposed placement, Community School North
("CSN") the IEP team would have called in CSN staff to
further revise the IEP to complement the details of the
setting.

The Notice of Recommended Educational Placement ("NOREP") following the

IEP meetings offered EK full-time emotional support services in a public school

environment, i.e., Community School North.  See Document #13-2 at 25.  The NOREP

explained that the IEP team considered a recommendation from the Rehabilitation

Center, i.e., Clear Brook Lodge, from which EK had been recently released, and after

considering that information and the other educational information available related to

EK, the recommendation was made.  Id.  It also explained that the school team

considered EK's mother's concerns about separating EK from the peer group who had

been negative in the past.  Id. at 26.  The recommended placement at Community School

North in Lebanon County satisfied the recommendation of an alternative school setting,

---

[5]  Following this finding of fact, the Hearing Officer added the following footnote which
bears repeating here:  [7] Although the Parent spent considerable time during her case in chief
criticizing the IEP, this case was really about the Parent's desire for a residential setting to
address [EK's] drug addiction and out-of-control home behaviors.

16

and assuaged EK's mother's concerns by separating EK from her former troublesome peer group.

I note that the record reflects that EK's placement at Community School North in Lebanon County was chosen for prime consideration as a center-based emotional support program because it was outside the community of students with whom EK had previously been and because it had a stronger program of supportive counseling than the geographically-closer Community School in Lancaster County.  Its counseling services are preferred over those at Warwick High School because the staff at Community School North are available to students throughout the day to problem-solve situations as they arise, and also to conduct daily group counseling sessions.  Accordingly, the District made two central recommendations: (1) implement an IEP with more intensive services at Community School North; and (2) participate in the Child & Adolescent Service System Program ("CASSP") process in order to access community-based mental health services.  The District anticipated that mental health providers from outside the school would partner with the District, perhaps providing some of their services in school and some in the community.

On December 9, 2008, consistent with her previously-expressed focus on a private residential setting in New York state, EK's mother rejected the District's recommendations, indicating, "This placement does not provide the level of therapeutic support [EK] needs at this time and does not provide general [education] academics/credits needed to apply for college after graduation."  See Document #13-2 at

27.  EK's mother chose instead to continue homebound instruction for EK.  The District had intended to stop the homebound instruction after the winter break, but continued for about two more weeks to provide make-up hours from the beginning of the school year under the old script.  The District informed EK's mother that she would have to submit another physician's note for EK to be eligible for further homebound study.  In her decision, the Hearing Officer added,

> "Not directly relevant to the issues, but illustrative of the Parent's wanting her own way and/or blaming the District for [EK] 'sitting home,' was her response when she was told the District needed another doctor's note ordering homebound instruction.  Mother said that she 'was not going to the psychiatrist again to get the homebound script, that made no sense to [her] at all.'"

<u>See</u> Hearing Officer's Decision, Finding of Fact #47.  Thereafter, the District again offered to send EK to Community School North when school reopened after the winter break, and also offered the alternate option of EK attending Warwick High School.  At the time, EK was at home pending her acceptance into Family Foundation School.

Also in her decision, the Hearing Officer thoroughly reviewed and considered the record evidence pertaining to Mary Davis, M.D., EK's treating psychiatrist, as reflected in these Findings of Fact:

> 49.  [EK's] consulting psychiatrist performed an evaluation that was, "not an evaluation for purposes of educational issues.  It [was] a psychiatric evaluation for treatment purposes."  The psychiatrist does not do educational evaluations in her current practice, and does not review reports from schools.  She had not read [EK's]

school evaluations or school records, and did not formally diagnose her with ADHD in her report.

50.  The consulting psychiatrist did not recommend that [EK] be placed in a residential setting for educational purposes.  She has recommended that [EK] not attend the public school where she had problems with peers [Warwick High School], that she attend an alternative school or a nontraditional school such as Lancaster Academy (the Mall School) and/or that she receive homebound instruction.

51.  The consulting psychiatrist only put her recommendation for a residential school into writing after the mother had located and visited the Family Foundation and only after the mother had filed for a due process hearing.  The consulting psychiatrist wrote, "I believe it would be in [EK's] best interests to be in a residential treatment setting ... Her relationships with others are unlikely to be appropriate without such interventions ..." The reasons provided by the consulting psychiatrist that a residential treatment center was in [EK's] best interests did not pertain to her IDEA disability (other health impairment by reason of ADHD, a diagnosis which this psychiatrist did not confer) but rather to learn to manage emotions, understand her anger, and obtain daily structure including enough supervision.

52.  From August to December 2008, [EK's] illicit drug abuse had worsened.  The consulting psychiatrist did not explicitly recommend reentry into a drug treatment program in December because she believed [EK] would be getting drug abuse treatment in a residential setting fairly quickly.

53.  Although the consulting psychiatrist noted that "everything else had failed" she does not know and could not answer whether [EK] is likely to succeed in any other setting than residential.

19

54.  Instructionally, the consulting psychiatrist recommended a small class (eight students or fewer) where the adults in the room would be able to notice whether [EK] was on task and would be able to intervene if she was not on task or veering off toward unsafe behavior.

70.  The consulting psychiatrist has no knowledge about any of the programs offered at CSN or the particular emotional support program at CSN that the District recommended for [EK].  She assumed that [EK's] recommended class had only a similar "trouble[d] youth" population to other Community Schools in Lancaster and Lebanon Counties.

These findings of fact are well-supported in the record.  A review of the administrative hearing reveals that Dr. Davis testified that her evaluation of EK lacked any IDEA disability terminology because "it's not an evaluation for purposes of educational issues.  It's a psychiatric evaluation for treatment purposes."  See N.T. 02/20/09 at 109.  Dr. Davis does not do educational evaluations in her current practice, and does not look at reports from schools when doing her evaluations.  Id. at 121.  She commented that she did not think about EK as having ADHD.  Id. at 107-108.  Dr. Davis recommended that EK stay away from Warwick High School because of her previous problems, but rather attend an alternative school or a nontraditional school like Lancaster Academy, or that she continue to receive homebound instruction.  Id. at 119-120.  Nevertheless, three weeks after EK's mother called for a meeting, Dr. Davis wrote,

"I believe it would be in EK's best interests to be in a residential treatment setting.  Her relationships with others are unlikely to be appropriate without such interventions."

20

It is important to note that Dr. Davis never cited EK's IDEA disability as the reason for her recommending a residential setting.  She referred instead to EK's need to learn to manage her emotions, to understand her anger, and to provide for her a daily structure.  Id. at 97.  When asked whether EK was likely to succeed in a setting other than the one she described, Dr. Davis responded, "I don't know that I can answer that."  Id. at 99.  She continued to refer to the benefits of a residential treatment setting for EK, not for educational reasons, but in terms of providing enough supervision to prevent running away and self-mutilation in order to provide for EK's safety.  In August 2008, Dr. Davis noted:

> EK was staying out all night, sneaking out when grounded, not following house rules, and was again using drugs.  She was not taking her bedtime insulin…and was openly defiant to mother. Mother felt helpless and hopeless…

EK's mother confirmed the accuracy of this report.  From August 2008 to December 2008, EK's drug abuse worsened.  Dr. Davis believed that EK would receive the drug abuse treatment in a residential setting fairly quickly.  In December 2008, Dr. Davis provided a written evaluation of EK because EK's mother was searching for an appropriate residential placement for EK.  Dr. Davis noted that EK was involved with drugs and was not listening to her mother's limits to any significant degree.  She recommended that EK be placed in a small class where adults in the room would be able to intervene and help EK return to whatever the task at hand might be and help her manage her emotions.  Id. at 114.

Dr. Davis also testified that she has no knowledge of the programs offered at Community School North or the particular emotional support program there that was recommended for EK by the District.  Id. at 109-112.  Dr. Davis indicated that she would need to go to Community School North in order to ascertain whether it offered EK sufficient structure to address her emotional and educational needs.

It is clear that the Hearing Officer properly found that Dr. Davis did not recommend that EK be placed in a residential setting for educational purposes, but rather to learn to manage her emotions, to understand her anger, and to obtain a daily structure including enough supervision.  As such, the psychiatrist's recommendation did not pertain to EK's IDEA disability, and the Hearing Officer correctly discounted the weight afforded it.

At the hearing, the Hearing Officer also took the testimony of Susan Logan, an Assistant Principal at Warwick High School.[6]  In her decision, the Hearing Officer properly reviewed and considered Ms. Logan's testimony:

> 61.  An Assistant Principal at Warwick High School who taught at a residential treatment facility, consulted as an IU employee with the Community Schools in Lancaster and Lebanon Counties, and served as a special education consultant within the District's secondary education program confirmed that the staff at [Community School North] is well trained to be aware of and to intervene with drug and alcohol problems and the emotional issues that underlie those problems.

---

[6]  Ms. Logan testified on the basis of her experience in various programs and her knowledge of EK through written reports, Dr. Davis's testimony, and EK's IEP.  She has never met EK in person.  See Notes of Testimony 02/20/09 at 161.

56.  The District, based upon evaluation by the school psychologist who found her disability category to be other health impaired by reason of her ADHD, but also in consideration of [EK's] recent history of inpatient and day drug addiction treatment, offered a placement at Community School North during school hours and recommended that the parent and school team access the CASSP process to obtain home and community based services, and possibly additional school services, through the mental health system.  The Parent rejected the idea of a CASSP meeting because "we have, you know, already tried the coordination of services."

57.  [Community School North] was chosen for [EK] for several reasons: it offers daily group counseling sessions and the availability of counselors for individual assistance as problems arise, and none of the students with whom [EK] had previously abused substances attended that program.

59.  Many of the students in the Community Schools' special education programs for students with disabilities have emotional disturbance and some have other health impairments such as ADHD.

Ms. Logan's background includes teaching at a residential treatment facility, consulting as an Intermediate Unit employee with what are called "Community Schools" in Lancaster and Lebanon counties, and serving as a special education consultant within Warwick School District's secondary education program.  See N.T. 02/20/09 at 140-144. Ms. Logan described the Community Schools as encompassing alternative programs for disruptive youth and special education programs for students with disabilities.  Many of the students with disabilities at those schools have emotional disturbance, some have other health impairments such as ADHD.  Drug and alcohol problems among Community

23

School students are not uncommon.  Drug and alcohol problems are addressed programmatically in the special education programs in the Community Schools.  Id. at 146.  Community School North has both an alternative education program and a special education program.  These programs are separate and the students in them are separated. Students attend the special education program because of their need for center-based emotional support, not as a result of disciplinary or disruptiveness issues.

Ms. Logan also testified that in the Community School North special education program, each class consists of six students, a certified teacher, and an assistant.  Id. at 147.  "They are there delivering the instruction, monitoring the behaviors, implementing behavior support plans."  Id.  This team is supplemented by a behavior support assistant who has a separate reflection area for students who request self-timeouts or who need a "cool-off" period to deal with an issue that has arisen.  The program also utilizes a social worker, a psychologist, a job trainer, a nurse, and a private therapist whose services are contracted by the District.  Id.  Ms. Logan also indicated that the staff at Community School North is well-trained to be aware of and to intervene on account of drug and alcohol problems and the emotional issues that underlie those problems.  Id. at 148. Community School North students work under a school-wide behavior support plan and individual support plans.  Id. at 150.  Community School North approaches students with the view that emotional progress and behavioral progress are closely related.  Id. at 152. It offers counseling, and sees social skills development as a separate, directly instructional activity.  Staff are trained to recognize frustration and anxiety in students

and to intervene immediately when there are signs of these emotional issues.  Community School North provides a highly-structured environment with one-hundred percent supervision.  Id. at 155.

Ms. Logan also testified that, based on Dr. Davis's description of EK, EK's needs are typical of the needs of students in the Community School North special education program.  Id. at 157, 164.  She further indicated that the Community School North special education program already provides the services that are necessary to address EK's needs.  Id. at 164.  Considering EK's academic strengths and her weaknesses in other areas, Ms. Logan concluded that the instruction in Community School North's special education program is sufficiently differentiated to meet EK's needs.  Id. at 165.  Upon cross-examination, Ms. Logan indicated that Dr. Davis "was verbatim explaining what the Community School has to offer," when she discussed EK's needs.  Id. at 212-213, 223.  This included external systems to help EK regulate her mood and her need to self-medicate, not just access to traditional academics.  Id. at 213.  In fact, when the Hearing Officer asked if Ms. Logan felt that Community School North was an appropriate placement for EK, Ms. Logan responded, "I would say, in my professional opinion, it is absolutely an appropriate placement."  Id. at 221.

At the hearing, the Hearing Officer also took the testimony of Yvette Line-Koller, a certified school psychologist and the District's Director of Student Services.  See N.T. 05/18/09 at 689.  In her Findings of Fact, the Hearing Officer properly summarized Dr. Line-Koller's testimony as follows:

25

> 69.  One of the District's certified school psychologists
> who is the District's Director of Student Services noted
> that CSN is appropriate in terms of the consulting
> psychiatrist's observation about [EK's] difficulty
> extricating herself from chaotic relationships and in
> relation to the consulting psychiatrist's recommendation
> that [EK] be with adults who can help her manage her
> emotions and stay on task or return to task.

Dr. Line-Koller testified that the 2008 IEP was the result of several months of meetings

and communications between the District and EK's mother.  Id. at 703-705.  The IEP was

repeatedly revised during those months to include a more intense level of psychological

services, especially after the staff at Clear Brook Lodge suggested an alternative school

placement.  Id. at 703-704, 715, 760.  Dr. Line-Koller compared the programs at

Community School North and at Warwick High School, and said that the staff at

Community School North is available every moment of the day for a student to interact

with, and to problem-solve any situation that develops.  Id. at 709.  In addition, there are

group counseling sessions as part of the daily structure there.  As much as the District

tries to have those services at Warwick High School, they are just not part of the design

of that program.  Id.  She finally testified that in her judgment, Community School North

is an appropriate setting in terms of Dr. Davis's observations about EK's difficulty in

extricating herself from chaotic relationships and her need to be with adults who can help

her manage her emotions and stay on task or return to task when necessary.  Id. at 720-

721.

       After an exhaustive review of the record, I find no extrinsic evidence contradicting

the Hearing Officer's finding that the IEP offered by the District is appropriate for EK.

The IEP was reasonably calculated to confer meaningful educational benefit upon EK.  It

identified EK's needs and her educational levels; it set goals in multiple areas; and it

provided for full-time emotional support services for EK in a public school environment.

In offering the IEP, the District proposed a reasonable educational program and

placement to address the needs related to EK's ADHD, while also acknowledging and

programming around additional social and therapeutic needs.  A school district cannot be

held responsible for treating a student's longstanding drug addiction, familial problems,

or delinquent behavior.  In particular, having offered an appropriate program and

placement, the District cannot be required to fund residential treatment for these issues in

a non-special education setting unilaterally chosen by a parent.  Accordingly, I find that

the Hearing Officer properly found that the District offered EK an appropriate

educational program and placement to address her ADHA.

        2.  <u>Evaluation of the Private School Selected under the Operative Standard</u>

Having found that EK had received an appropriate IEP from the District, the

Hearing Officer was not required to proceed to an evaluation of the appropriateness of

Family Foundation School as a placement for EK.  Nevertheless, the Hearing Officer

continued out of an abundance of caution and found that that school was not an

appropriate setting for EK.  I agree.

The record contains a telephone deposition of Renee Gotthardt, a licensed clinical

social worker who works for the Family Foundation School as a counselor.  <u>See</u> N.T.

04/21/09 at 406.  Ms. Gotthardt described the early years of Family Foundation School as "a place to stay sober, a place to gain friendships."  It has become a college preparatory therapeutic boarding school with approximately two hundred students from grade six through grade twelve.  <u>Id.</u> at 408.  Its students are not allowed to attend the local public school.  Currently, twenty-five to thirty percent of the students at the school have not used drugs or alcohol, while fifty percent have dependency issues with alcohol and substances.  <u>Id.</u> at 409.  Most of the students have been diagnosed either with oppositional/defiant disorder or conflict disorder; many have eating disorders, aggression problems, anger problems; and some have been diagnosed with bipolar depression and others with ADHD.  <u>Id.</u>  The school is a therapeutic milieu with formal counseling sessions built into the academic schedule.  <u>Id.</u> at 412.  Extracurricular activities such as newcomer Alcoholics Anonymous meetings and religious instruction are built into the schedule.  <u>Id.</u>

Ms. Gotthardt testified that the school is based on the twelve-step program of Alcoholics Anonymous.  <u>Id.</u> at 419.  Each student is given a "sponsor," i.e., a staff member who is responsible for mentoring the student and guiding him or her through the twelve steps.  <u>Id.</u>  The student is also given a "junior sponsor," who is a senior student with responsibilities for the student similar to those of the sponsor.  The minimum stay at Family Foundation School is eighteen months to ensure "long-term change."  <u>Id.</u> at 466, 468, 480.

Ms. Gotthardt also testified that EK is a typical Family Foundation School student

28

with a history of substance abuse, and long-standing difficulties with her parents.  See N.T. 04/21/09 at 421.  Her problem in the classroom was not that she was distracted, but that she was flirtatiously distracting.  Id. at 422.  EK was also on a communication ban with boys and with other newer students.  Id. at 424.  Family Foundation School attributed some of EK's behavior problems to fear, frustration, and an inability to regulate her emotions.  Ms. Gotthardt stressed that Family Foundation School is not a special education setting, and does not create IEP's or behavior support plans for students.  Id. at 445, 471.  All staff are committed to the school's "Twelve-step" program. Id. at 473.  On cross-examination, when asked what three leading problems could be attributed to EK, Ms. Gotthardt first responded, "I think overwhelmingly – I mean, she had the alcohol and substance abuse."  Id. at 474.

Although a determination of the appropriateness of the Family Foundation School was unnecessary here, a review of the record, especially the testimony of Ms. Gotthardt, reveals that the Hearing Officer correctly found that the Family Foundation School was not an appropriate educational placement in the least restrictive environment to address EK's ADHA.  The choice of Family Foundation School, while rational, was a response to EK's drug addiction, not her disability.  Nothing makes that more apparent than an email sent by EK's mother to Dr. Line-Koller, expressing her concerns about the IEP's recommended placement:

> "With both her serious ***mental health and drug/alcohol problems*** I feel [EK] needs, at this point, constant support and reinforcement of the skills she is going to need to be

> successful until it becomes habit.  She needs to live it
> every day, all day, for a long period [of] time.  I also feel
> she needs to be surrounded by peers who are all working
> towards a common **goal of recovery/getting healthy** and
> are all there to support each other . . .

See Document #27-1 at 8 (Emphasis added).  The IDEA requires a school district to

address issues related to a child's disability, but does not require that district to address

the child's need for adult supervision as part of drug rehabilitation.  Accordingly, I find

that the Hearing Officer did not err when she determined, in the alternative, that the

Family Foundation School was an inappropriate setting for EK.

### C.  Compensatory Education

Where a district court finds that a school district failed to provide a FAPE as

required under the IDEA, the court may award compensatory relief to the plaintiff student

in the form of appropriate educational services within the district, sometimes referred to

as "compensatory education."  Mary T. v. Sch. Dist. of Philadelphia, 575 F.3d 235, 249

(3d Cir. 2009).  Compensatory education is a judicially-created remedy not defined

within the IDEA.  See Ferren C. v. Sch. Dist. of Philadelphia, 612 F.3d 712, 717 (3d Cir.

2010).  The Supreme Court has interpreted the IDEA to grant federal courts the power to

apply equitable considerations in awarding this remedy.  See Florence Cnty Sch. Dist.

Four v. Carter, 510 U.S. 7, 7 (1993); Burlington, 471 U.S. at 374.  Compensatory

education is awarded to account for the period of time that a plaintiff student was

deprived of her right to a FAPE.  See Mary T., 575 F.3d at 249.  This remedy accrues

from the point that the school district knew or should have known that an IEP failed to

confer a greater than *de minimis* educational benefit to the student.  Id.  Thus, the

calculation for compensatory relief should be for a period equal to the period of

deprivation, less the time reasonably required for the school district to rectify the

problem.  Id.

EK was not denied a FAPE by the District at any relevant time.  Accordingly, she

is not entitled to compensatory education.

### D.  Counts 3 and 4 -- Rehabilitation Act and Americans with Disabilities Act[7]

The IDEA and § 504 of the Rehabilitation Act do similar statutory work.  P.P. v.

West Chester Area Sch. Dist., 585 F.3d 727, 735 (3d Cir. 2009).  In fact, the IDEA and §

504 provide nearly equivalent requirements.  The IDEA provides an affirmative duty to

provide education, whereas the Rehabilitation Act prohibits discrimination against the

disabled.  W.B. v. Matula, 67 F.3d 484, 492-493 (3d Cir. 1995) (*abrogated on other*

*grounds by* A.W. v. The Jersey City Pub. Sch., 486 F.3d 791 (3d Cir. 2007)).  "There

appear to be few differences, if any, between IDEA's affirmative duty and § 504's

negative prohibition."  Matula, 67 F.3d at 492-493.  The IDEA protects the rights of

---

[7]  In Count Three, EK brings a claim under the Rehabilitation Act.  In Count Four, she brings a
claim under the Americans with Disabilities Act.  The standards governing claims brought under
these Acts are identical.  See Chambers v. Sch. Dist. of Phila., 587 F.3d 176, 189 (3d Cir. 2009).
The only real difference is that, in proving such a discrimination claim under the ADA, a
plaintiff does not need to prove that a defendant receives federal funding.  See Chambers ex rel.
Chambers v. Sch. Dist. of Philadelphia, 587 F.3d 176, 189 (3d Cir. 2009) (citing McDonald v.
Commonwealth of Pennsylvania, Dept. of Pub. Welfare, Polk Ctr., 62 F.3d 92, 95 (3d Cir.
1995)).  I shall specifically address only the claim brought under the Rehabilitation Act which
analysis applies equally to the ADA claim.  Accordingly, because I find that the District did not
violate its obligations pursuant to Section 504, I reach the same conclusion with respect to EK's
ADA-based claim.

disabled children by mandating that public educational institutions identify and

effectively educate those children, or pay for their education elsewhere if they require

specialized services that the public institution cannot provide.  Id.  Section 504 is parallel

to the IDEA in its protection of disabled students: it protects the rights of disabled

children by prohibiting discrimination against students on the basis of disability, and it

has child find, evaluation, and FAPE requirements, like the IDEA.

      Also like the IDEA, Section 504 prohibits discrimination on the basis of disability

by programs that receive federal funds, including public schools.  See Ridley Sch. Dist. v.

M.R., 680 F.3d 260, 265 n.1 (3d Cir. 2012) (citing 29 U.S.C. § 794).  Title 29 of the

United States Code, Section 794(b)(2)(B) provides that "[n]o otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected

to discrimination under any program or activity receiving Federal financial assistance."

      Under Section 504, a "school district must reasonably accommodate the needs of

the handicapped child so as to ensure meaningful participation in educational activities

and meaningful access to educational benefits."  Ridley, 680 F.3d at 280.  "However, §

504 does not mandate 'substantial' changes to the school's programs, and courts should

be mindful of the need to strike a balance between the rights of the student and h[er]

parents and the legitimate financial and administrative concerns of the [s]chool [d]istrict."

Id. at 280-281.

      Section 504's implementing regulations require the District to "provide a free

appropriate public education to each qualified handicapped person who is in the

recipient's jurisdiction, regardless of the nature of severity of the person's handicap."  34

C.F.R. § 104.33(a).  Under Section 504, an appropriate education is defined as "the

provision of regular or special education and related aids and services that (i) are

designed to meet individual educational needs of the handicapped persons as adequately

as the needs of non-handicapped persons are met and (ii) are based on adherence to the

procedures that satisfy [certain] requirements" regarding educational settings, evaluation

and placement, and procedural safeguards.  34 C.F.R. § 104.33(b); see also Ridley, 680

F.3d at 280 ("To offer an 'appropriate' education under the Rehabilitation Act, a school

district must reasonably accommodate the needs of the handicapped child so as to ensure

meaningful participation in educational activities and meaningful access to educational

benefits.")

     To establish a violation of § 504 of the Rehabilitation Act, a plaintiff must prove

that (1) she is disabled; (2) she is "otherwise qualified" to participate in school activities;

(3) the school district received federal financial assistance; and (4) the plaintiff was

excluded from participation in, denied the benefits of, or subject to discrimination by the

school district.  Ridley, 680 F.3d at 280 (citing Ridgewood Bd. of Educ. v. N.E. ex rel.

M.E., 172 F.3d 238, 253 (3d Cir. 1999)); see also Andrew M. v. Del. Cnty. Office of

Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).  The parties do

not dispute the first three elements.  Rather, the only issue is whether EK was denied the

benefit of an education program or was subject to discrimination by the School District.

33

Because I have determined that the record supports the Hearing Officer's decision that the District satisfied its duty of providing EK a free and appropriate public education, I find that EK has not met her burden of demonstrating that the accommodations provided to her by the District were insufficient to ensure "meaningful participation in educational activities and meaningful access to educational benefits." Ridley, 680 F.3d at 280. The record, as discussed above, reveals that the District amply met the standard requiring it to provide accommodations and supports that allowed EK to participate effectively in an educational program despite the effects of her ADHD.

### E.  Conclusion

The crux of this case is EK's mother's strong belief that EK would have received a better education at the Family Foundation School. While that belief might be an accurate one, the IDEA does not require a state to provide an ideal education to its disabled children. The Third Circuit has explained,

> "The IDEA does not require the School District to provide [a disabled child] with the best possible education. However, the School District does not meet its burden by simply showing that an appropriate program may be available. Instead, the School District must show that the proposed IEP will provide [the child] with a meaningful educational benefit."

S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 271 (3d Cir. 2003). A school district is only responsible to provide financial support for a private placement if the stay at that facility is necessary primarily to provide educational services. While it is undisputed that EK received substantial academic support at the Family Foundation

School, the record is clear that EK did not attend that school primarily to address educational issues.  Although EK's mother should be commended for the care and energy she has devoted to EK's educational and emotional needs, I must be careful to adhere to the relevant statutes' mandates that a child is entitled to a free appropriate public education in the least restrictive environment, and not to an ideal education.  The evidence as it was evaluated by the Hearing Officer, and by this court on *de novo* review, proves by a preponderance of the evidence that the IEP and its placement at Community School North would have provided the meaningful educational benefits to which EK was entitled.  The record shows that the District worked with EK's mother to design the IEP, and even revised the IEP as necessary to include the recommendations of the staff at Clear Brook Lodge.  EK's mother rejected the IEP, preferring instead the residential setting at Family Foundation School.  Given my finding that the IEP was appropriate for EK, and that it conferred a meaningful educational benefit upon EK in the least restrictive environment, I must find that EK is entitled neither to reimbursement for tuition paid to send her to the Family Foundation School, nor to compensatory education.  Accordingly, I will grant the defendant's motion for judgment on the administrative record, and deny the plaintiff's motion.

An appropriate Order follows.